STATE OF CONNECTICUT *v.* JEFFREY MITCHELL

STATE OF CONNECTICUT *v.* HOWARD TINNEY, JR.
(12977)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and MULCAHY, Js.

Argued April 7— decision released June 23, 1987

Milo J. Altschuler, for the appellants (defendants).

Michael E. O'Hare, assistant state's attorney, with whom were John M. Massameno, and, on the brief, Gerard Esposito, assistant state's attorneys, for the appellee (state).

SHEA, J. The Appellate Court set aside the judgments of the trial court granting the defendants' motions to exclude pretrial and in-court identifications, to suppress seized property, and to dismiss the information with prejudice in both cases. *State* v. *Mitchell,* 7 Conn. App. 46, 507 A.2d 1017 (1986). Having certified this combined appeal, we now conclude that the Appellate Court's judgment must be reversed with respect to the suppression of the identifications, which will therefore be excluded from evidence during further trial court proceedings in these cases.

Although the underlying facts are set forth in detail in *State* v. *Mitchell,* supra, we summarize those pertinent to the issues in this appeal. The defendants, Jeffrey Mitchell and Howard Tinney, Jr., were charged in two count informations with sexual assault in the second degree, in violation of General Statutes § 53a-71 (a) (1), and risk of injury to or impairing the morals of a child, in violation of General Statutes § 53-21. These charges arose out of an alleged sexual assault occurring on Sunday evening, July 22, 1984, upon a fourteen year old girl, which she reported to the Ansonia police department. In response to the complaint, Officer Michael J. Kennedy went to see the victim at her grandmother's home in Derby at approximately 11 p.m. Shortly thereafter, Officers Peter Zaskiewicz and Mark Ptak, also of the Ansonia police department, joined Kennedy and then took the victim to the Griffin Hospital in Derby.

While at her grandmother's home, the victim told Kennedy that she had been assaulted in the parking lot of the Bradlees Department Store in Derby by two men riding in a Datsun. En route to the hospital, Zaskiewicz conversed further with the victim, who then described her assailants' car as "a white, bullet-shaped sportscar with white wheels, which she identified as a Mazda." *State* v. *Mitchell,* supra, 50. Her assailants, she said,

were two black men in their early twenties, one taller than the other.

Because the victim stated that she had been assaulted in Derby, the Ansonia officers contacted the Derby police department, which dispatched Officers Joseph Iacuone and Eugene Mascolo to the hospital at approximately 11:30 p.m. The victim elaborated upon her rendition, telling the Derby officers that, "as she was walking through the Bradlees parking lot, two men got out of a white, torpedo-shaped sports car with shiny wheels, which she thought was a Mazda, and chased her to the end of the lot, where they caught her and assaulted her near the adjacent Baskin-Robbins ice cream store." Id. The victim stated that the taller man wore maroon sweatpants and a tee shirt, and that the shorter man wore jeans and a tee shirt. She further said that one of the men was named "Mike."

At the hospital, Zaskiewicz told Derby officer Robert Proto, who had also been assigned to investigate the incident, "that he knew that the defendant, Howard Tinney, Jr., drove a white Mazda RX-7 with silver wheels." Id., 51. After Zaskiewicz had given Tinney's address on Scotland Road in Ansonia, Proto and Mascolo went to Scotland Road, arriving at the area of the Tinney residence about 2 a.m., the morning of July 23, 1984. A short while later, a white Mazda generally fitting the description given by the victim drove up followed by a white Thunderbird. Two black males exited the Mazda and entered the Thunderbird, which was being operated by a woman. Mascolo had recognized the shorter man as the defendant Tinney, who was wearing dark blue sweatpants and a tee shirt; the taller man was the defendant Mitchell, who wore jeans and a shirt. When the Thunderbird began to drive away, Proto pulled it over and advised the occupants that he was investigating a sexual assault.

Subsequently, in a ten minute talk with Zaskiewicz, who had joined the other officers, the defendants denied any involvement in the assault, claiming that they had spent the evening in Waterbury and in a bar in Ansonia. The defendants were told, nevertheless, that they "would have to go" to the Griffin Hospital for a field identification. Id. Upon arriving at the hospital between 2:15 and 2:30 a.m., the defendants were required to wait in the police car about twenty-five minutes while a physician treated the victim. When the victim, seated in a wheelchair, was brought within twenty feet of the defendants, as they stood in the emergency room, she positively identified Tinney as one of her assailants, and said she was "pretty sure" Mitchell was the other.[1] Id., 52. At that point the defendants were arrested. The victim was next taken to Scotland Road, where she identified the white Mazda as the one driven by her assailants, and also claimed to recognize a helmet and a wicker basket visible through the rear window of the car.

Later, at approximately 4 a.m., at the Derby police headquarters, the victim retold her account of the assault. Upon being asked to sign the typewritten transcript of that account, she hesitated, and asked instead to talk to her mother. After speaking to her mother, the victim provided and then signed a version of the facts different from the one she had just given, claiming now that it was false. According to her new account, she had gone from her grandmother's house to Olson Drive in Ansonia at about 8:30 p.m. the previous eve-

---

[1] "Prior to the identification of the defendants, the victim had been asked to identify three other men at the hospital. The first two were young black men whom the police stopped on the street near the hospital and brought into the emergency room for a possible identification. The victim knew these two men and did not identify them as her assailants. The third was a black man who had come to the emergency room for treatment. The victim also knew him, and did not identify him as one of her assailants." *State* v. *Mitchell,* 7 Conn. App. 46, 52 n.1, 507 A.2d 1017 (1986).

ning. There she met a friend, who introduced her to two black men in a white sports car, whom she called "Jeff" and "Mike." Accepting the invitation of these two men to go for a ride, the victim was taken to Nolan Field, where, according to her statement, the men gave her cocaine and forced her to have sex with them.[2]

The white Mazda, which was registered to Tinney's mother, was towed to the Ansonia police department at about 6:30 a.m. At about 9:30 a.m., a warrant was issued to search the car. Items seized during the subsequent search included "glassine bags and cellophane packages with white powder traces, other materials commonly associated with cocaine use, and a 'cigarette lighter phone with residue.' " Id., 54.

The trial court ruled that, because "identification by one on one show-up is unnecessarily suggestive," the victim's identification of the defendants at the hospital was suppressible. The court further found the victim "not to be credible," referring to such factors as her admittedly fabricated first account of the crime and her confusion about the vehicle manufacturer, the color of the sweat pants, and the clothing in relation to the height of the assailants. As a result, the court also suppressed the photographic[3] and in-court identifications made by the victim, finding that they could not have been "wholly independent" of, but had been based upon, the earlier hospital identification.

---

[2] At the hearing on the defendants' motions, the victim stated "that she initially falsified the location and details of the assault because she did not want her mother to know that she had been in the Olson Drive area of Ansonia, which was an area mainly populated by black people, and that she did not want her mother to know that she had entered the car voluntarily." *State* v. *Mitchell,* 7 Conn. App. 46, 53 n.3, 507 A.2d 1017 (1986).

[3] Sometime after having identified the defendants at the hospital, the victim identified the defendants from a photoboard. The defendants' pictures contained in the display were the mug shots taken of them on the night they were arrested.

Additionally, the trial court granted the defendants' motions to suppress evidence relating to the Mazda, the items found inside, and the property seized from the persons of the defendants. The court found that the defendants had been seized without probable cause. Calling the seizure of the car "warrantless and without justification," the court noted that no proof had been offered that "the Tinney vehicle was ever at the Baskin-Robbins or on Olson Drive," or that the helmet and wicker basket identified by the victim from outside the car, when she was taken from the hospital to view the Mazda as it was parked on Scotland Road, had previously been seen by her. Finally, the court granted the defendants' motions to dismiss the informations with prejudice, which motions claimed "insufficient reason or evidence to continue the prosecution . . . ." See General Statutes § 54-56; Practice Book § 815 (5). From the Appellate Court judgment setting aside the judgment of the trial court, the defendants have brought the present combined appeal.

## I

The defendants first claim that the Appellate Court erred in concluding both that the police had made a valid investigative detention of the defendants on Scotland Road, and that the taking of the defendants to the hospital was within the permissible bounds of that detention. See *State* v. *Mitchell*, supra, 57–63. The defendants contend that, because their detention was illegal, any evidence obtained thereby must be suppressed, including the hospital identification by the victim, "mug shots," fingerprints, and the defendants' clothing.[4] We find this ground for suppression of the evidence to be unpersuasive.

---

[4] The defendants purport to rely upon both article first, § 7 of our state constitution and the fourth amendment to the United States constitution. The defendants quote the language of this court in *State* v. *Kimbro,* 197 Conn. 219, 233, 496 A.2d 498 (1985), that article first, § 7, "affords more

## A

We first examine the reasonableness of the warrantless stop on Scotland Road of the defendants by officers Proto, Mascolo, and Zaskiewicz. We agree with the Appellate Court that "the stop of the defendants on Scotland Road was not an arrest, which would have required probable cause, but was an investigative stop requiring only reasonable and articulable suspicion." *State* v. *Mitchell,* supra, 58; see *Delaware* v. *Prouse,* 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *State* v. *Januszewski,* 182 Conn. 142, 147–48, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). The constitutional issue raised by this stop, therefore, is whether the actions of the Derby and Ansonia police officers exceeded the permissible limits of an investigative detention under *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The state concedes on appeal that, as the trial court found, the defendants were "seized" in the sense that

substantive protection to citizens than does the fourth amendment to the federal constitution in the determination of probable cause." In *Kimbro,* this court discussed the proper test to be applied in determining whether an informant's tip had provided a sufficient basis for a finding of probable cause. We rejected the "totality of the circumstances" analysis set out by the United States Supreme Court in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), adopting instead the stricter two-prong *"Aguilar-Spinelli"* test, which considers, on the one hand, an informant's "veracity" and "reliability," and, on the other hand, his "basis of knowledge." See *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). We decline to extend our disparate treatment of state and federal search and seizure provisions to the facts of this case. See *State* v. *Braxton,* 196 Conn. 685, 688 n.2, 495 A.2d 273 (1985); see also *State* v. *Ostroski,* 186 Conn. 287, 290–92, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); *State* v. *Derrico,* 181 Conn. 151, 157–58, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *State* v. *Duhaime,* 33 Conn. Sup. 129, 133, 365 A.2d 837 (1976).

they were "not free to leave" when they were stopped on Scotland Road. It has been frequently iterated that the constitution forbids only unreasonable searches and seizures. See *Terry* v. *Ohio,* supra, 9; *Elkins* v. *United States,* 364 U.S. 206, 222, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960); *State* v. *Januszewski,* supra, 148. *Terry* v. *Ohio* established that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry* v. *Ohio,* supra, 22. In determining what cause is sufficient to authorize police to stop a person, courts have considered whether, based upon "the totality of the circumstances," the detaining officers had " 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *United States* v. *Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); see also *Brown* v. *Texas,* 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *United States* v. *Brignoni-Ponce,* 422 U.S. 873, 884, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); *State* v. *Scully,* 195 Conn. 668, 674, 490 A.2d 984 (1985). "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry* v. *Ohio,* supra, 21 n.18; see also *State* v. *Aillon,* 202 Conn. 385, 399, 521 A.2d 555 (1987); see generally 3 W. LaFave, Search and Seizure (1987) § 9.3 (b).

We conclude that Proto, Mascolo and Zaskiewicz were justified in stopping the defendants based upon the victim's descriptions of the assailants and their car. Those descriptions were sufficient to give rise to a reasonable suspicion that the defendants were the two black males who had assaulted the victim. See *United States* v. *Hensley,* 469 U.S. 221, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985) (extending *Terry* to permit

detention of persons reasonably suspected of involvement in completed crime). The age of the defendants, their relative heights, the fact that one wore jeans while the other wore sweatpants and that the two were riding in a white Mazda sports car were all characteristics that corresponded to the information given by the victim. We agree with the Appellate Court that the existence of discrepancies between the victim's descriptions and the actual appearance of the defendants "does not, in and of itself, vitiate the reasonable suspicion created by the similarities." *State* v. *Mitchell,* supra, 59; see also *District of Columbia* v. *M.M.,* 407 A.2d 698, 701 (D.C. App. 1979); *Matter of J.G.J.,* 388 A.2d 472, 474 (D.C. App. 1978).

The test enunciated by the United States Supreme Court of whether an investigative stop passes constitutional muster balances the nature of the intrusion upon personal security against the importance of the governmental interest inducing the intrusion. See *United States* v. *Hensley,* supra, 228. A strong law enforcement interest has been particularly recognized in the context of felonies or violent crimes, because "it is in the public interest that the crime be solved and the suspect detained as promptly as possible." Id., 229. Furthermore, when the situation in which a suspect has been detained has afforded him a lesser expectation of privacy; see, e.g., *Rakas* v. *Illinois,* 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *South Dakota* v. *Opperman,* 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976); fourth amendment protections have been deemed to be correspondingly less stringent. *Winston* v. *Lee,* 470 U.S. 753, 767, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985). A felony such as the one reported in the present case, a sexual assault upon a child, is certainly among those warranting prompt resolution. The defendants were detained on a public street at approximately 2 a.m., circumstances that are reasonably

regarded as involving a less than maximal expectation of privacy. See generally *Adams* v. *Williams,* 407 U.S. 143, 147–48, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *State* v. *Carter,* 189 Conn. 611, 617, 458 A.2d 369 (1983). Thus, our conclusion that the initial stop of the defendants was constitutionally valid is consistent with an evaluation of that stop under the delineated balancing test.

## B

We must next determine whether the police, in transporting the defendants to the hospital for a viewing by the victim, exceeded the permissible scope of the investigative detention. A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. See *United States* v. *Sharpe,* 470 U.S. 675, 684, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Florida* v. *Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). "Like the determination of initial justification, this inquiry is fact-bound." *State* v. *Aillon,* supra, 401; see also P. Bator & J. Vorenberg, "Arrest, Detention, Interrogation and the Right to Counsel: Basic Problems and Possible Legislative Solutions," 66 Colum. L. Rev. 62, 63 (1966). "The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." *State* v. *Watson,* 165 Conn. 577, 585, 345 A.2d 532 (1973); see also *State* v. *Aillon,* supra; *State* v. *Carter,* supra, 618.

The record indicates that, from the initial stop to the ultimate identification by the victim at the hospital, a

total of thirty-nine minutes elapsed. During that period, the detaining officers spoke with the defendants, who were seated in their friend's car, for about ten minutes, drove the defendants to the hospital, a ride lasting about four minutes, and then caused the defendants to remain seated in the police car for some twenty-five minutes while the victim was being treated, "during which time Tinney asked if he could call his father and was told by Proto that 'as soon as we finish you can do anything you want . . . .' " *State* v. *Mitchell,* supra, 52.

The United States Supreme Court has acknowledged that there may be "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest. Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops." *United States* v. *Sharpe,* supra, 685. The court in *Sharpe* continued, setting forth the following test: "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id., 686; see also *Michigan* v. *Summers,* 452 U.S. 692, 701 n.14, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981), quoting 3 W. LaFave, Search and Seizure (1978) § 9.2, p. 40.

Our review of the record convinces us that the Appellate Court correctly concluded that the detaining officers acted diligently to pursue a means of investigation that was likely to confirm or dispel their suspicions quickly, i.e., "display of the defendants to the victim while her memory was still fresh . . . ." *State* v. *Mitchell,* supra, 62. It is beyond dispute that the major portion of the detention, the twenty-five minute wait

while a physician treated the victim, did not result from any dilatoriness on the part of the officers. Moreover, the denial by the defendants of any involvement in the sexual assault, during their initial talk with the officers, was not necessarily so convincing as to have dispelled the questions in the officers' minds. *State* v. *Watson,* supra. We conclude that, under the circumstances of this case, the defendants' thirty-nine minute detention was reasonable. Compare *United States* v. *Sharpe,* supra, 686–88 (twenty minute stop held to be reasonable), and *United States* v. *Richards,* 500 F.2d 1025, 1029 (9th Cir. 1974), cert. denied, 420 U.S. 924, 95 S. Ct. 1118, 43 L. Ed. 2d 393 (1975) (one hour detention held to be reasonable), with *United States* v. *Place,* 462 U.S. 696, 710, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) ("the prolonged 90-minute detention . . . is sufficient to render the seizure unreasonable").

We note that detaining a suspect to effectuate a viewing by witnesses to a crime has been deemed to be a permissible investigative technique. See *United States* v. *Short,* 570 F.2d 1051, 1054 (D.C. Cir. 1978); *State* v. *Aversa,* 197 Conn. 685, 692, 501 A.2d 370 (1985); *Buckingham* v. *State,* 482 A.2d 327, 334 (Del. 1984); *Davis* v. *United States,* 498 A.2d 242, 245 (D.C. App. 1985); *Finney* v. *State,* 420 So. 2d 639, 643 (Fla. App. 1982); *People* v. *Canity,* 100 Ill. App. 3d 135, 149–50, 426 N.E.2d 591 (1981); *State* v. *Byers,* 85 Wash. 2d 783, 785, 790, 539 P.2d 833 (1975); *State* v. *Isham,* 70 Wis. 2d 718, 724, 235 N.W.2d 506 (1975); cf. *People* v. *Harris,* 15 Cal. 3d 384, 391, 124 Cal. Rptr. 536, 540 P.2d 632 (1975). Further, requiring a suspect to accompany a police officer to another place, after *Terry,* does not necessarily transform what would otherwise be a permissible investigatory seizure into an arrest. See *United States* v. *Short,* supra; *People* v. *Stevens,* 183 Colo. 399, 407, 517 P.2d 1336 (1974); *State* v. *Griffin,* 459 A.2d 1086, 1089–90 (Me. 1983); *State* v. *Byers,* supra, 790.

In sum, we find no error in the conclusion of the Appellate Court that the seizure of the defendants, from the initial stop on Scotland Road to the viewing by the victim at the hospital, was a valid investigative detention. Accordingly, we disagree with the defendants that the seizure provides a basis for the suppression of the hospital identification and of any other evidence consequently obtained from the persons of the defendants.[5]

## II

The defendants next claim that the Appellate Court erred in holding that the initial identification of the defendants by the victim at the hospital was neither impermissibly suggestive nor unreliable. The trial court had determined that, because "identification by one on one show up is unnecessarily suggestive," and because the subsequent out-of-court and in-court identifications were a product of the hospital viewing, such identifications must be suppressed. We conclude that the trial court's granting of the defendants' motions to suppress the identifications was not erroneous as a matter of law, and, therefore, that the holding of the Appellate Court to the contrary must be reversed.

---

[5] In this appeal, the defendants do not take issue with the holding of the Appellate Court that, "once the victim identified them at the hospital, probable cause to arrest them clearly existed. Thus, their arrests were valid, as were any searches of their persons that followed." *State* v. *Mitchell*, 7 Conn. App. 46, 70, 507 A.2d 1017 (1986); see *State* v. *Magnotti*, 198 Conn. 209, 214, 502 A.2d 404 (1985). Although, in the discussion that follows, we reverse the Appellate Court in respect to the validity of the hospital identification, the conclusion of the Appellate Court that there was probable cause to arrest the defendants remains valid. The suggestiveness of the identification procedure, which requires suppression of the victim's identification at a trial, does not substantially detract from the reasonableness of police reliance upon that identification in concluding that there was probable cause for an arrest of the defendants. Cf. *Jones* v. *United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960); *Draper* v. *United States*, 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); *Brinegar* v. *United States*, 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949).

This court has adopted a two-pronged inquiry in determining whether identification procedures have violated a defendant's due process rights. First we address whether the identification procedure was unnecessarily suggestive. If so, the second question becomes whether the identification was nevertheless reliable based on an examination of the "totality of the circumstances." See *Manson* v. *Brathwaite,* 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Ramsundar,* 204 Conn. 4, 10, 526 A.2d 1311 (1987); *State* v. *Miller,* 202 Conn. 463, 470, 522 A.2d 249 (1987); *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980).

The show-up, or one-to-one confrontation between a victim and the suspect police present to him, has been deemed "inherently and significantly suggestive; *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976); because it conveys the message that the police have reason to believe the suspect guilty. *State* v. *Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979)." *State* v. *Maturo,* 188 Conn. 591, 595–96, 452 A.2d 642 (1982); see also *State* v. *Guertin,* 190 Conn. 440, 456, 461 A.2d 963 (1983). Upon finding suggestive circumstances, courts have then asked whether such circumstances were impermissible or unnecessary. See *Stovall* v. *Denno,* 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). Hospital room show-ups have been upheld as necessary where a serious injury has disabled the witness or defendant. See *Stovall* v. *Denno,* supra; *Trask* v. *Robbins,* 421 F.2d 773, 775 (1st Cir. 1970); *Johnson* v. *People,* 172 Colo. 72, 81, 470 P.2d 37 (1970); *People* v. *Young,* 6 Ill. App. 3d 119, 123, 285 N.E.2d 159 (1972); *People* v. *Rivera,* 22 N.Y.2d 453, 455, 293 N.Y.S.2d 271, 239 N.E.2d 873 (1968). In other instances, however, hospital show-ups have been considered unnecesssary because the suspect or witness has been in no immediate danger of death. See *Smith* v. *Coiner,* 473 F.2d 877, 880–81 (4th Cir.), cert. denied

sub nom. *Wallace* v. *Smith,* 414 U.S. 1115, 94 S. Ct. 848, 38 L. Ed. 2d 743 (1973); *People* v. *Stock,* 15 Ill. App. 3d 722, 728, 304 N.E.2d 646 (1973).

In the present case both defendants were brought into the foyer of the hospital emergency room. The victim, seated in a wheelchair, was wheeled by them twice. This identification procedure was inherently suggestive. Because the victim, at the time of the show-up, was neither in immediate danger of death nor seriously injured, the trial court's finding that such suggestiveness was unnecessary was not unreasonable. Although it might have been difficult to assemble a full lineup at 2:30 a.m., the victim, taken immediately after the show-up to Scotland Road to view the Mazda, could just as readily have been taken to view the defendants in a more neutral setting. Even presenting the defendants to the victim individually, rather than as a pair, would certainly have been a less suggestive alternative. Thus, we disagree with the Appellate Court's assertion that the initial identification procedure was not impermissibly suggestive.

The next inquiry under the two-pronged approach is whether the hospital identification, in the context of the totality of the circumstances, was nevertheless reliable. The factors to be considered in making this determination "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite,* supra, 114; *State* v. *Ramsundar,* supra, 10–11. The Appellate Court stated that a careful reading of *Manson* indicates that this reliability inquiry "is a question of admissibility of evidence, not of whether the identification is to be

believed . . . . Short of the point at which the iden-
tification procedure produces ' "a very substantial
likelihood of irreparable misidentification" '; [*Manson*
v. *Brathwaite,* supra, 116]; the identification 'evidence
*is for the jury to weigh* . . . .' (Emphasis added.) Id.,
116." *State* v. *Mitchell,* supra, 66.

Although, based on the allegations of the victim, the
trial court might reasonably have regarded the hospi-
tal identification as sufficiently reliable to protect the
defendants' due process rights, we cannot agree with
the Appellate Court that such a conclusion was required
as a matter of law. The reliability inquiry delineated
in *Manson* is fact-bound and made on an ad hoc basis.
Generally, where the admissibility of evidence depends
upon a preliminary question of fact to be determined
by the court, "its decision is not to be reversed unless
there is clear and manifest error." *Engelke* v. *Wheatley,*
148 Conn. 398, 410–11, 171 A.2d 402 (1961); see Prac-
tice Book § 4061; *State* v. *Brigandi,* 186 Conn. 521, 530,
442 A.2d 927 (1982).

In its oral memorandum of decision, the trial court
expressed concern about such factors implicating the
reliability determination as the victim's degree of atten-
tion and the accuracy of her prior description of the
assailants. The court referred to the victim's inabil-
ity to describe the shirts worn by her assailants after
allegedly having been with them for two and one-half
hours, "the fact that she initially thought the car was
a Datsun and that she had never made a positive [iden-
tification] of [the defendant] Mitchell," and the victim's
confusion about the "size and facial characteristics and
clothing" of her assailants, and also about their names
and the color of the sweatpants worn by one of them.
Although the trial court did not expressly structure
these concerns into a reliability inquiry, or style them
as such, we note that the state did not seek an articu-
lation of the factual basis for the court's conclusions

as provided in Practice Book § 4051. See *Foster* v. *Waterford,* 186 Conn. 692, 694 n.4, 443 A.2d 490 (1982); see also *Carpenter* v. *Carpenter,* 188 Conn. 736, 739 n.2, 453 A.2d 1151 (1982); *Kaplan* v. *Kaplan,* 186 Conn. 387, 388 n.1, 441 A.2d 629 (1982). Because it cannot be said that the trial court's assessment of the hospital identification of the defendants by the victim was clearly erroneous, we must reverse the decision of the Appellate Court in respect to that identification.

Concluding that the trial court had erred in granting the defendants' motions to suppress the hospital identification, the Appellate Court found no need to inquire whether that initial identification had tainted the subsequent photographic and in-court identifications. See *State* v. *Mitchell,* supra, 67. That the initial identification had been invalid, however, placed the state under a constitutional restraint to establish an independent basis for the subsequent identifications. Thus, the burden was on the state to establish by clear and convincing evidence that the subsequent identifications were based on the victim's independent recollection. See *State* v. *Guertin,* supra, 459; *State* v. *Gold,* 180 Conn. 619, 656, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Lee,* 177 Conn. 335, 339–40, 417 A.2d 354 (1979). The trial court found that the state "should have but has not proven to the Court that the [photographic and in-court identifications made by the victim] could be wholly independent . . . of the one on one identification made at the Hospital . . . ." Nothing in the record demonstrates that the court exceeded its prerogative as the trier in drawing that conclusion. We conclude that the Appellate Court erred in overturning the trial court's judgment in respect to the granting of the defendants' motions to suppress the hospital and subsequent identifications.

## III

The defendants' final claim is that the Appellate Court erred in reversing the trial court's dismissal of the pending informations based on the insufficiency of the evidence. The Appellate Court determined, in effect, that the trial court, in granting the defendants' motions to dismiss, had abused the discretion conferred upon it by General Statutes § 54-56.[6] That statute allows the court to dismiss an information at any time, upon motion of the defendant, "if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial." General Statutes § 54-56; see *State* v. *Corchado,* 200 Conn. 453, 460, 512 A.2d 183 (1986). We affirm the judgment of the Appellate Court in this respect.

In this appeal the defendants have not challenged the holding of the Appellate Court that defendant Tinney's white Mazda and the evidence seized therein had been improperly suppressed because, "[o]nce the victim positively identified the car as the one in which her assailants were sitting before they chased her and assaulted her, the police had probable cause to believe that the car contained evidence of the crime. . . . Once the police lawfully seized the vehicle on the basis of proba-

---

[6] "[General Statutes] Sec. 54-56. DISMISSAL OF INFORMATION BY COURT. All courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial."

See also Practice Book § 815 (5), which provides: "The following, if capable of determination without a trial of the general issue, shall, if made prior to trial, be raised by a motion to dismiss the indictment or information . . . . (5) Defenses or objections based on the insufficiency of evidence or cause to justify the bringing or continuing of such information or indictment or the placing of the defendant on trial."

ble cause, they had the authority to search it without the necessity of securing a warrant."[7] *State* v. *Mitchell,* supra, 71; see also *United States* v. *Johns,* 469 U.S. 478, 484, 105 S. Ct. 881, 83 L. Ed. 2d 890 (1985); *United States* v. *Ross,* 456 U.S. 798, 825, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982); *State* v. *Johnson,* 183 Conn. 148, 154, 438 A.2d 851 (1981). The defendants are therefore deemed to have abandoned any claim of error in respect to this holding. See *Pepe* v. *New Britain,* 203 Conn. 281, 282 n.1, 524 A.2d 629 (1987); *Blancato* v. *Feldspar Corporation,* 203 Conn. 34, 36 n.3, 522 A.2d 1235 (1987); *State* v. *Bowen,* 167 Conn. 526, 533, 356 A.2d 162 (1975).

"On a motion to dismiss an information, the proffered proof is to be viewed most favorably to the state." *State* v. *Morrill,* 193 Conn. 602, 611, 478 A.2d 994 (1984). Wholly apart from the victim's identifications of the defendants, we agree with the state that her positive identification of the Mazda, including her recognition of some of the items contained therein, and her description of her assailants, despite some inaccuracies, provide sufficient evidence of the defendants' identity as her assailants to justify placing the defendants on trial. General Statutes § 54-56. Accordingly, we conclude

---

[7] In the Appellate Court the defendant Tinney argued that the warrant issued at 9:30 a.m., July 23, 1984, to search his car was invalid. This defendant premised his contention "on the fact that the supporting affidavit, which tracked the victim's second, signed statement describing the incident as it occurred in the car at Nolan Field, did not disclose that the victim had earlier given a different and false version to the police. Thus, Tinney argues, the warrant was invalid under *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)." *State* v. *Mitchell,* 7 Conn. App. 46, 71-72, 507 A.2d 1017 (1986). Although it had concluded that the police had the authority, in this case, to search the car without the necessity of having secured a warrant, the Appellate Court noted that, in any event, Tinney had conceded at oral argument that he had failed to make the "substantial preliminary showing" required by *Franks* as a precondition to obtaining an evidentiary hearing challenging the truthfulness of an affidavit supporting a search warrant. See id., 72; see generally *Franks* v. *Delaware,* supra, 155-56, 171-72.

that the Appellate Court correctly found error in the granting by the trial court of the defendants' motions to dismiss.

The judgment of the Appellate Court is reversed in part, and the cases are remanded to that court with direction to remand them to the trial court for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.