RONALD RICKS *v.* COMMISSIONER OF CORRECTION
(AC 25711)

Bishop, McLachlan and Rogers, Js.

Argued September 19—officially released November 21, 2006

*Katherine C. Essington*, special public defender, for the appellant (petitioner).

*Gerard P. Eisenman*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

McLACHLAN, J. The petitioner, Ronald Ricks, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the court improperly concluded that he failed to prove his claim of ineffective assistance of counsel. We affirm the judgment of the habeas court.

The court reasonably could have found the following facts. On December 12, 1997, two black males wearing ski masks entered a market on Madison Avenue in Bridgeport and demanded money from the owner. One of the males, the shorter of the two, carried a gun and was pointing it at the owner and the only customer in the market as he approached the cash register. When the owner went to open the register, the gunman killed the owner by shooting him in the chest with the .25 caliber handgun. The taller of the two males then went behind the counter and took money from the register and took a gun that was on the counter next to the register. Both males ran from the market. A taxicab driver saw them fleeing the scene.

On the basis of information provided by a confidential informant, several police officers went to the petitioner's home at Highridge Drive in Bridgeport on the afternoon of December 18, 1997. At approximately 3:40 p.m., the petitioner exited his house and was approached by two officers. One of the officers asked him if his mother was at home, to which he replied that she had just left to pick up his sister. Mildred Ricks, the petitioner's

---

[1] The habeas court granted the petition for certification to appeal to this court.

mother, returned at approximately 4:15 p.m. An officer advised her that they were investigating an incident that may have involved the petitioner and some guns. She became visibly upset and asked the petitioner if there were any guns in her house. He responded that there was a gun under a couch. Upon the officer's request, both the petitioner and his mother signed consent to search forms. A .38 caliber Smith & Wesson revolver was located under the couch in the petitioner's bedroom and removed from the house.

Shortly after locating the gun, two officers transported the petitioner to the Bridgeport police station. He was handcuffed at that time for officer safety because there was no cage in the transporting vehicle. Upon arrival and before questioning, an officer advised the petitioner of his Miranda[2] rights. The petitioner acknowledged that he understood those rights both verbally and in writing. He was interviewed, and he signed a sworn statement describing his involvement in the homicide at the Madison Avenue market.[3] His mother was not with the petitioner when he waived his rights or when he gave and signed his statement. The petitioner was sixteen years of age at that time.

The petitioner was arrested and charged with felony murder in violation of General Statutes § 53a-54c and robbery in the first degree in violation of General Statutes § 53a-134. He was arraigned on those charges, and the trial court appointed John Demirjian, a public defender, to represent him. The court also appointed the petitioner's mother as his guardian ad litem. On

---

[2] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The petitioner identified a fourteen year old juvenile, approximately five feet, seven inches in height, as the individual who shot the victim. The petitioner is approximately five feet eight or nine inches in height.

April 9, 1999, pursuant to a plea agreement, the petitioner entered a guilty plea under the *Alford* doctrine[4] to the charge of felony murder. The initial plea agreement provided that the petitioner would be sentenced to twenty-five years incarceration with the requirement that he testify truthfully at the trial of his codefendant. The court, *Comerford, J.*, after a thorough canvassing, found the petitioner's plea to have been knowingly and voluntarily made with the assistance of competent counsel. The court accepted the plea.

Prior to the imposition of the petitioner's sentence, he made a request to withdraw his guilty plea, claiming that he had been unaware that he was required to testify against his codefendant. The court replaced Demirjian with new counsel, Jason Gladstone, a special public defender. After the petitioner and his mother conferred with Gladstone, the petitioner entered into a new plea agreement that provided he would receive a sentence of thirty years and not be required to testify against his codefendant. The court, *Comerford, J.*, vacated the petitioner's previous guilty plea and thereafter began a new plea colloquy. After conducting a thorough canvass, the court found that the petitioner's second guilty plea was entered knowingly and intelligently and accepted the plea. The petitioner was then sentenced to thirty years incarceration, of which twenty-five years was mandatory.

The petitioner subsequently filed a second amended petition for a writ of habeas corpus in which he claimed that both of his trial counsel, Demirjian[5] and Gladstone,

---

[4] See *North Carolina* v. *Alford*, 400 U.S. 25, 35, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[5] In his appellate brief, the petitioner now takes the position that Demirjian's representation is not relevant in this appeal because the first guilty plea was vacated. The petitioner entered a second guilty plea and was sentenced pursuant to a plea agreement reached while he was represented by Gladstone. Accordingly, the petitioner concedes that he cannot demonstrate that he was prejudiced by the conduct of Demirjian. Because they have not been briefed on appeal, any issues relating to Demirjian have been abandoned. See *In re William H.*, 88 Conn. App. 511, 522, 870 A.2d 1102 (2005).

had provided ineffective assistance. The habeas court rejected the petitioner's claim but later granted his petition for certification to appeal. On appeal, the petitioner claims that Gladstone's assistance was ineffective because he failed (1) to conduct a reasonable pretrial investigation and (2) to pursue motions to suppress the evidence taken in connection with the search of the petitioner's house and the statements he made in response to his mother's inquiry and at the police department. We disagree.

We first note our standard of review. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Baillargeon* v. *Commissioner of Correction*, 67 Conn. App. 716, 720, 789 A.2d 1046 (2002).

"Because a defendant often relies heavily on counsel's independent evaluation of the charges and defenses, the right to effective assistance of counsel includes an adequate investigation of the case to determine facts relevant to the merits or to the punishment in the event of conviction. . . . Regardless, counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it. . . .

"A habeas petitioner can prevail on a constitutional claim of ineffective assistance of counsel [only if he can] establish both (1) deficient performance, and (2) actual prejudice. . . . For ineffectiveness claims resulting from guilty verdicts, we apply the two-pronged standard set forth in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Levine* v. *Manson*, 195 Conn. 636, 639–40, 490 A.2d 82 (1985).

For ineffectiveness claims resulting from guilty pleas, we apply the standard set forth in *Hill* v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985), which modified *Strickland*'s prejudice prong. . . .

"To satisfy the performance prong, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. . . . A petitioner who accepts counsel's advice to plead guilty has the burden of demonstrating on habeas appeal that the advice was not within the range of competence demanded of attorneys in criminal cases. . . . The range of competence demanded is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . Reasonably competent attorneys may advise their clients to plead guilty even if defenses may exist. . . . A reviewing court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance . . . .

"To satisfy the prejudice prong, the petitioner must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill* v. *Lockhart*, supra, 474 U.S. 59 . . . . Reasonable probability does not require the petitioner to show that counsel's deficient conduct more likely than not altered the outcome in the case, but he must establish a probability sufficient to undermine confidence in the outcome. *Strickland* v. *Washington*, supra, 466 U.S. 693–94 . . . . The *Hill* court noted that [i]n many guilty plea cases, the prejudice inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate . . . the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood

that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. *Hill* v. *Lockhart*, supra, 59 . . . . A reviewing court can find against a petitioner on either ground, whichever is easier." (Citations omitted; internal quotation marks omitted.) *Baillargeon* v. *Commissioner of Correction*, supra, 67 Conn. App. 721–23.

I

The petitioner claims that his guilty plea was not made knowingly and voluntarily because Gladstone was ineffective in failing to investigate the case adequately. Specifically, the petitioner claims that his counsel did not (1) independently interview witnesses or hire an investigator to conduct a factual investigation of all the surrounding circumstances of the case, (2) research potential suppression issues and (3) move to suppress the petitioner's statements and the evidence seized from the search of his house. We first address the claimed failure to conduct an independent investigation.

At the habeas trial, Gladstone testified that he was requested to represent the petitioner·as a special public defender in connection with his motion to withdraw a previously entered guilty plea. Along with the written request, Gladstone received copies of all motions, discovery and reports that had been filed in the case. He met with the petitioner and the petitioner's mother on June 18, 1999, the day scheduled for the hearing on the motion to withdraw the plea. Before the hearing, the three of them thoroughly reviewed all of the documentation in the file and discussed the petitioner's options.

Gladstone testified that he discussed the elements of the crimes, the minimum and maximum sentences possible if the petitioner was found guilty of the crimes, and the likelihood of his success at trial. Gladstone told

the petitioner and his mother that the state had two witnesses who overheard the petitioner and his codefendant bragging about the robbery and shooting at the Madison Avenue market, that two other witnesses were present at the crime scene although they could not positively identify the perpetrators, that both the petitioner and his mother had signed consent forms leading to the discovery of the gun that had been stolen from the market and that the intent to commit the felony could be inferred from the fact that the perpetrators were wearing ski masks at the time they entered the market. Gladstone also indicated that he spoke with the prosecutor and the judge as to a possible plea bargain agreement.

After that lengthy discussion, the petitioner and his mother decided that it would be best for the petitioner to plead guilty to the charge of felony murder. Because of that decision, reached after a thorough review of the petitioner's file and the discussion of the facts with the petitioner and his mother, Gladstone did not consider it necessary to hire an investigator or to interview additional witnesses.

On cross-examination, Gladstone testified that he never made a specific recommendation as to whether the petitioner should proceed to trial. After he spoke at length with the petitioner and his mother, he left it to them to make the decision. Gladstone testified that he did not believe that there was any possibility that the statutory defense to felony murder would be successful if raised by the petitioner. He also testified that he did not believe a motion to suppress the seized evidence, i.e., the gun, as well as the petitioner's statements, would be successful because of the signed voluntary consents to search.

The petitioner's mother testified that she came to the conclusion that the petitioner should accept the offered

plea agreement on the basis of the information provided by Gladstone. Although she testified at some length about Demirjian, she gave no other testimony with respect to Gladstone.

The petitioner testified that he wanted to withdraw his original guilty plea because no one explained to him that he would have to testify at the trial of his codefendant.[6] Gladstone was then appointed to represent the petitioner. The petitioner testified that he told Gladstone that he should interview Donald Beach, one of the witnesses at the crime scene, and three other individuals who were questioned by police on the day of the homicide.[7] According to the petitioner, Gladstone told him that those witnesses would not be helpful to his case. He further testified that Gladstone never informed him as to the minimum or maximum penalties for the crimes charged, did not advise him as to any options other than pleading guilty, and relayed the terms of the plea offer and recommended that he accept it without providing any reasons for that recommendation.

In its memorandum of decision, the court concluded that Gladstone was more than adequate in his preparation for trial. The record indicated that he interviewed

---

[6] The court noted that it did not find the petitioner's testimony believable: "[I]t is clear from the April 9, 1999 transcript that Judge Comerford went over this aspect of the agreement at least three separate times and ascertained directly from the petitioner [that] he understood his obligation to testify truthfully. The petitioner's contradictory testimony at the habeas trial is not credible and is indicative of mendacity on the part of the petitioner."

[7] According to the petitioner, Beach gave a statement to police in which he described the taller perpetrator as being in his early twenties. The petitioner was sixteen years old at the time of the homicide.

The petitioner also claimed that the other three witnesses positively identified another individual as the taller perpetrator of the homicide at the Madison Avenue market. The respondent, the commissioner of correction, challenged the petitioner's statement on cross-examination and suggested that the witnesses said only that the identified individual was of the same size as the taller perpetrator.

the petitioner at length and had an extensive discussion with both the petitioner and his mother about the contents of the file. The court noted that Gladstone had access to and reviewed all of the materials possessed by Demirjian, which included the information provided by the state, the statements of witnesses and copies of the police reports.

Although the petitioner claims that Gladstone was obligated to conduct his own independent investigation and could not rely on the contents of Demirjian's file, no case law has been cited that supports such a position under the circumstances of this case. Gladstone already had the materials from Demirjian and discussed the case at length with the petitioner and his mother. We conclude that the court properly determined that the petitioner did not establish that Gladstone's performance was deficient when he failed to hire an investigator or to conduct his own interviews of witnesses.

## II

The petitioner also claims that Gladstone rendered ineffective assistance because he failed to research suppression issues and failed to file a motion to suppress the petitioner's statements and the gun that was seized from his bedroom. If his counsel had investigated the circumstances surrounding the petitioner's detention properly and researched the legal issues relative to the suppression of evidence, the petitioner claims, Gladstone would have concluded that the petitioner had been detained illegally and that the evidence flowing from that illegal detention could have been suppressed.

From the testimony and exhibits submitted at the habeas trial, the court reasonably could have found the following facts with respect to the circumstances leading to the detention of the petitioner. On December

18, 1997, Richard Herlihy, a detective with the Bridge-port police department, spoke with a confidential infor-mant about the shooting at the market on Madison Avenue. Through the informant, the police learned that the petitioner and his neighbor, a fourteen year old juvenile, had been bragging about robbing and shooting the owner at the market, that the petitioner had stolen the owner's .38 caliber handgun after he was shot, that the petitioner hid the stolen gun and a .25 caliber hand-gun in a wooded area near his home and that the peti-tioner subsequently moved both of the guns into his house. The informant described the petitioner as a black male, sixteen years of age, approximately five feet eight or nine inches in height.

On the basis of the information provided, several Bridgeport police officers went to the petitioner's home that same day to conduct an investigation. At approxi-mately 3:40 p.m., the petitioner exited the house. Two officers approached him and told him that they were investigating an incident in which he may have been involved. When asked if his mother was at home, he indicated that she had just left to pick up his sister. John Donovan, the commanding officer of the Bridgeport detective bureau at the time of the homicide, then arrived. He testified that several officers were around the perimeter of the house "maintaining the status quo" and that the petitioner was standing outside at that time. Donovan testified that he was told that the petitioner's mother was on her way back to the house. Shortly thereafter, she did return. When she arrived at approxi-mately 4:15 p.m., her son was sitting in a police vehicle. The door was open and his feet were hanging outside of the vehicle. An officer was positioned at each side of the vehicle.

After the petitioner's mother had identified herself, one of the officers advised her that they were investigat-ing an incident in which the petitioner and guns may

have been involved. At that point, she became visibly upset and turned her attention to the petitioner. She directly asked him whether there were any guns in her house. Before he could answer, she further stated that he had better tell her immediately if there were any guns inside. The petitioner responded that there was a gun under a couch. The petitioner's mother yelled at him for having a weapon in the house occupied by his younger siblings. At that time, she was asked if she would be willing to sign a consent to search form. She assented and signed the form in the presence of witnesses. The petitioner also signed a consent to search form. The officers then entered the house and located a .38 caliber Smith & Wesson revolver under the removable seat cushion of a couch in the petitioner's bedroom.

Shortly after the Smith & Wesson revolver was located, Ada Curet, a detective with the Bridgeport police department, transported the petitioner to the detective division. He was handcuffed at that time for officer safety because there was no cage in the transporting vehicle. Upon arrival and before questioning, Curet advised the petitioner of his *Miranda* rights. The petitioner acknowledged that he understood those rights both verbally and in writing. He was interviewed, and he signed a sworn statement as to his involvement in the homicide at the Madison Avenue market on December 12, 1997. He stated that his codefendant shot the victim and that he, the petitioner, went behind the counter, removed the money from the register and took a handgun from the counter next to the register. The petitioner's mother was not with him when he waived his rights or when he gave and signed his statement. The petitioner was sixteen years of age at that time.

The petitioner claims that the officers lacked a reasonable suspicion to approach him when he exited his home because the decision to do so was based solely on the information provided by the informant. Further,

the petitioner argues that because of his age, the number of police officers present at his home, the fact that he was put in a police car and the length of the encounter from the time he exited the house until he was transported to the detective division, his detention was illegal.[8] If, as claimed by the respondent, the commissioner of correction, the petitioner's detention was a permissible investigatory stop, the officers must be able to cite specific and articulable facts and inferences that can be drawn therefrom to establish that the intrusion was reasonably warranted. See *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). If, as claimed by the petitioner, his detention was an arrest, that seizure would have to be supported by probable cause. See *State* v. *Mitchell*, 204 Conn. 187, 194, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

We conclude that the detention of the petitioner under the circumstances of this case was an investigatory stop supported by a reasonable and articulable suspicion of criminal activity. Because of that conclusion, the gun seized from the petitioner's home, the statement he made to his mother and the confession he made at the police department were not obtained improperly. Gladstone's failure to pursue motions to suppress that evidence, therefore, did not constitute deficient performance.

We agree with the petitioner that he was "seized" when the officers stopped him for the investigation into the homicide at the Madison Avenue market. From a review of the transcript and exhibits, it appears that there were at least two uniformed officers and four detectives from the Bridgeport police department at

---

[8] The petitioner claimed that he was handcuffed when he was placed in the police car. That claim was not confirmed by his mother. Moreover, Curet reported that the petitioner was handcuffed just before he was transported to the police department, after the handgun was located in the house.

the petitioner's home on December 18, 1997. At some point before his mother returned to the house, the petitioner was asked to sit in the backseat of a police vehicle. One officer stood beside the petitioner's door and another stood by or sat in the driver's seat of the vehicle. The petitioner testified that he was handcuffed at that time, but no other witnesses corroborated that testimony.[9] His mother testified that he was in the backseat, with the door open and his legs extending outside. Curet, in her report, indicated that she handcuffed the petitioner when he was taken to the detective division because the transporting vehicle did not have a cage. Even though the petitioner was not handcuffed when he was initially detained, however, he was "seized" because his freedom of movement was restrained by a show of authority. A reasonable person would not believe that he was free to leave. See *State* v. *Oquendo*, 223 Conn. 635, 647, 613 A.2d 1300 (1992).

Because we conclude that there was a seizure, we must then determine whether the officers possessed a reasonable and articulable suspicion of criminal activity at the time the seizure occurred. See id., 645–46. "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying

---

[9] In its memorandum of decision, the court found that the petitioner was not a credible witness. See footnote 6. "This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . In a case that is tried to the court . . . the judge is the sole arbiter of the credibility of witnesses, and the weight to be given to their specific testimony." (Internal quotation marks omitted.) *State* v. *Silva*, 65 Conn. App. 234, 263, 783 A.2d 7, cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001).

the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *State* v. *Hammond*, 257 Conn. 610, 617, 778 A.2d 108 (2001).

Here, the police officers decided to investigate the possible participation of the petitioner in the Madison Avenue market homicide on the basis of information relayed to Herlihy by a confidential informant. Herlihy testified at the habeas trial, but was unable to recall any information about the informant at the time of trial. Although it was not an anonymous tip, the record does not disclose whether the police department had had prior reliable information from that particular informant. We therefore must determine whether the information implicating the petitioner had sufficient indicia of reliability. Id.

The informant identified the petitioner and his codefendant by name. Accurate physical descriptions were also provided. The informant indicated that both young men were bragging about the robbery and shooting at the Madison Avenue market. The police already knew from eyewitnesses at the crime scene that two young black males were the perpetrators, and the physical descriptions of the petitioner and the codefendant as given by the informant were consistent with those of the eyewitnesses. The informant also stated that the petitioner told the informant that he had stolen the store owner's .38 caliber handgun and had hidden it, along with a .25 caliber handgun, in a wooded area behind the petitioner's house and subsequently had moved both handguns into the house. The police already knew that the owner's .38 caliber handgun had been taken from the market by one of the perpetrators and that the owner was shot and killed by a .25 caliber handgun. The information provided by the informant

was, therefore, corroborated and had sufficient indicia of reliability.

On the basis of the informant's information, the officers had a reasonable and articulable suspicion to justify an investigative stop. We then consider whether that stop exceeded the permissible limits of an investigative detention under *Terry* v. *Ohio*, supra, 392 U.S. 1. "A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. . . . Like the determination of initial justification, this inquiry is fact-bound. . . . If . . . the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, supra, 204 Conn. 197.

In this case, a homicide was committed during the course of a robbery, unquestionably a serious and violent offense. "A strong law enforcement interest has been particularly recognized in the context of felonies or violent crimes, because it is in the public interest that the crime be solved and the suspect detained as promptly as possible." (Internal quotation marks omitted.) Id., 196. The police had information that two handguns might be hidden in the petitioner's home, a home in which several younger siblings lived. The petitioner was only sixteen years old, and the officers had no idea if he would panic and flee. His mother had left only a short time before they arrived, and she was on her way back to the house. Under those circumstances, it can be concluded that it was reasonable to maintain the status quo and keep the petitioner in a safe and observed location.

The officers approached the petitioner at 3:40 p.m. His mother returned to the house at approximately 4:15

p.m., a lapse of only thirty-five minutes.[10] Upon her arrival, she learned that guns might be involved and asked the petitioner if there was a gun in her house. He responded in the affirmative. They both signed consent to search forms, and the gun was located shortly thereafter. At that point, the petitioner was transported to the detective division in handcuffs. After he was given his *Miranda* warnings, the petitioner acknowledged his rights verbally and in writing and gave a statement. The petitioner was arrested on the basis of the information provided in his written, sworn statement. Under those circumstances, we conclude that the permissible limits of an investigative detention under *Terry* were not exceeded.

Because the detention was legal, it follows *a fortiori* that a motion to suppress the evidence obtained would not have been successful. "In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States* v. *Matos*, 905 F.2d 30, 32 (2d Cir. 1990). The petitioner failed to make this showing.

The petitioner stresses the fact that he was only sixteen years old at the time of his arrest, and that his mother was not present when he waived his *Miranda* rights and gave his written statement. In particular, he argues that his confession was involuntary and could have been suppressed on those grounds.[11] Although age

[10] A lapse of time of thirty-nine minutes was found reasonable for an investigative detention in *State* v. *Mitchell*, supra, 204 Conn. 197–98.

[11] Although age is only one factor to be considered in determining whether a statement was made voluntarily, the crux of the petitioner's argument is that his confession was involuntary because of his age and his mother's absence at the time he gave his confession. Case law does not support that position, but rather is contrary to it. See *State* v. *Spyke*, 68 Conn. App. 97, 104–105, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002).

Although the argument was not squarely presented, the petitioner cursorily mentions in his appellate brief that he may have been deprived of food

is a factor to be taken into account in determining whether a statement is voluntary, it is only one of many factors, and a court must consider all of the circumstances surrounding the making of the statement. See *State* v. *McColl*, 74 Conn. App. 545, 564, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003). At sixteen years of age, the petitioner is considered legally competent to make a confession, and the absence of his mother at the time he gave it does not render his statements inadmissible.[12]

The court, after considering all of the circumstances, properly could have concluded that the petitioner voluntarily signed the consent to search form and that he gave a voluntary statement at the police department. His other statement, concerning the presence of the gun in the house, was made in direct response to his mother's inquiry and was not elicited by the officers. Any challenge to that statement is without merit. After considering the parties' written and oral arguments to this court, and our own review of the record and transcript, we conclude that the habeas court properly concluded that Gladstone's performance did not violate the petitioner's constitutional right to effective assistance of counsel.

during his interview at the police department. At his habeas trial, the petitioner stated that he was told to cooperate with the officers and then he would be given some food. We again note that the court did not find the petitioner to be a credible witness. See footnote 6. Moreover, Curet testified that she interrupted the interview to obtain food for the petitioner when he indicated that he was hungry.

[12] If a child, defined as a person younger than sixteen years of age, gives a statement or confession, a parent or guardian must be present in order for that statement or confession to be admissible. See General Statutes §§ 46b-120 and 46b-137 (a). The protections of § 46b-137 (a), however, do not apply to confessions made by children who are prosecuted as adults in criminal court. The protections apply only to proceedings in Juvenile Court. *State* v. *Ledbetter*, 263 Conn. 1, 4, 818 A.2d 1 (2003). Clearly, because of his age and the fact that his case was pending in adult criminal court, the protections of § 46b-137 (a) do not apply to the petitioner.

### III

Even if we assume arguendo that Gladstone's performance was deficient and that the petitioner's detention illegally exceeded the limits of a reasonable investigatory stop, the petitioner nevertheless failed to satisfy the prejudice prong set forth in *Strickland* v. *Washington,* supra, 466 U.S. 668, as modified by *Hill* v. *Lockhart,* supra, 474 U.S. 52, for ineffectiveness claims resulting from guilty pleas.

With respect to the claim that Gladstone should have interviewed witnesses or hired an investigator to conduct a factual investigation, the petitioner fails to indicate how an investigator would have been helpful to his case or in what way he was prejudiced by Gladstone's failure to hire one. The same is true with respect to the claim that Gladstone independently should have interviewed certain witnesses identified by the petitioner at his habeas trial. No evidence was submitted that would indicate that the testimony of those witnesses would have affected the outcome of the petitioner's case.

The petitioner's claim that he was prejudiced by Gladstone's failure to file a motion to suppress because he was detained illegally and that all of the evidence seized at his home as well as his confession at the police department could have been suppressed likewise is not persuasive. Even if the petitioner was illegally detained while the officers awaited the return of his mother, the only evidence likely to have been suppressed would have been the consent to search form signed by the petitioner. The record is clear that the petitioner's mother signed a separate consent to search form after she learned from the petitioner that there was a gun in her house.

The statement made by the petitioner as to the existence and location of the gun in the house was made

in response to a direct inquiry from his mother. After learning from the officers that they were investigating an incident in which the petitioner might have been involved and that guns were involved, the petitioner's mother yelled at her son and demanded to know if there were any guns in the house. The petitioner had several siblings, and from the mother's remarks it was clear that she was concerned about their safety. His statement would not have been suppressed because it was elicited by his mother and not the officers.

Because the mother's consent to search form was voluntarily given, the gun seized from the house was legally obtained by the officers. After the gun was seized, the circumstances changed and the petitioner was transported to the detective division. He was given his *Miranda* warnings at that time. "The factors to be considered in determining whether the statement of an accused is sufficiently attenuated from the original illegality to cleanse it of its taint are (1) whether *Miranda* warnings had been issued, (2) the temporal proximity of the illegal police action and the statement, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *State* v. *Brunetti*, 279 Conn. 39, 73, 901 A.2d 1 (2006). Thus, even though "the exclusionary rule bars the government from introducing at trial evidence obtained [as a result of an unreasonable search and seizure]"; (internal quotation marks omitted) id., 72; the petitioner has not shown that he was prejudiced because the only product of the claimed illegality would have been the petitioner's consent to search form. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The petitioner failed to prove his claim of ineffective assistance of counsel. He did not show that his counsel's performance was deficient. Even if he had demonstrated deficient performance, he did not show actual

prejudice. See *Hill* v. *Lockhart,* supra, 474 U.S. 59; *Strickland* v. *Washington,* supra, 466 U.S. 687.

The judgment is affirmed.

In this opinion the other judges concurred.