******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

BRANDON GUSAN *v.* COMMISSIONER
OF CORRECTION
(AC 46490)

Bright, C. J., and Suarez and Sheldon, Js.*

*Syllabus*

The petitioner, who previously had been convicted, on a plea of guilty, of possession of a controlled substance with intent to sell, appealed, on the granting of certification, from the judgment of the habeas court denying his petition for a writ of habeas corpus. He claimed, inter alia, that the court erred in rejecting his claim that his right to the effective assistance of trial counsel was violated. *Held*:

This court concluded that it was unnecessary for it to consider whether the habeas court was correct in its assessment of the performance of the petitioner's trial counsel because, even if his counsel were deficient in failing to file motions for discovery and to suppress, the petitioner failed to demonstrate, in accordance with *Strickland* v. *Washington* (466 U.S. 668) and *Hill* v. *Lockhart* (474 U.S. 52), that he was prejudiced as a result of those omissions, as he did not demonstrate a reasonable probability that a motion to suppress would have been granted.

Argued September 18, 2024—officially released March 18, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (petitioner).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Elizabeth Moseley*, senior assistant state's attorney, for the appellee (respondent).

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

*Opinion*

SUAREZ, J. Upon the granting of certification to appeal, the petitioner, Brandon Gusan, appeals from the judgment of the habeas court denying his corrected, revised, first amended petition for a writ of habeas corpus. The petitioner claims that the court erred in rejecting his claim that his right to the effective assistance of trial counsel was violated by virtue of his trial counsel's failure (1) to file a motion for discovery with respect to data that had been extracted from his cell phone and (2) to file a motion to suppress evidence obtained following an allegedly illegal traffic stop. We affirm the judgment of the habeas court.

The record reflects the following undisputed procedural history. In March, 2017, the petitioner pleaded guilty pursuant to the doctrine set forth in *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970),[1] to one count of possession of a controlled substance with intent to sell in violation of General Statutes (Rev. to 2015) § 21a-277 (b).[2] After accepting

---

[1] "Under *North Carolina* v. *Alford*, [supra, 400 U.S. 37], a criminal defendant is not required to admit his guilt, but consents to being punished *as if he were guilty* to avoid the risk of proceeding to trial. . . . A guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless. . . . The entry of a guilty plea under the *Alford* doctrine carries the same consequences as a standard plea of guilty. By entering such a plea, a defendant may be able to avoid formally admitting guilt at the time of sentencing, but he nonetheless consents to being treated as if he were guilty with no assurances to the contrary." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 204–205, 842 A.2d 567 (2004).

[2] Hereinafter, all references to § 21a-277 in this opinion are to the 2015 revision of the statute.

The petitioner's plea was the result of a plea agreement with the state concerning charges that arose from the petitioner's alleged conduct on February 26, 2016. The state brought charges against the petitioner under two docket numbers. In the first case, the state charged the petitioner with operating a motor vehicle while holding a telephone or an electronic device in violation of General Statutes § 14-296aa (b) (1) and operating a motor

the plea, the court, *Oliver, J.*, imposed a total effective sentence of twenty-five months of incarceration followed by fifty-nine months of special parole. The petitioner was represented by Attorney Jefferson Jelly prior to and at the time of sentencing, including during the plea negotiation stage.

In August, 2017, the petitioner, in a self-represented capacity, filed a petition for a writ of habeas corpus. In March, 2022, the petitioner, represented by counsel, filed the operative petition, a corrected, revised, first amended petition for a writ of habeas corpus, in which he alleged a deprivation of his right to the effective assistance of trial counsel as guaranteed by the state and federal constitutions. In count one of the petition, the petitioner alleged that Jelly performed deficiently in a number of ways, including by failing to file a motion for discovery with respect to data that had been extracted from his cell phone and by failing to file a motion to suppress evidence obtained following an

vehicle without a license in violation of General Statutes (Rev. to 2015) § 14-36 (a). See *State* v. *Gusan*, Superior Court, judicial district of Tolland, Docket No. MV-16-0376112-S. Following the petitioner's plea, the state did not continue to pursue the charges brought under this docket number, instead entering a nolle prosequi to those charges. As our Supreme Court has explained, "[t]he effect of a nolle is to terminate the particular prosecution of the defendant without an acquittal and without placing him in jeopardy. . . . Therefore, the nolle places the criminal matter in the same position it held prior to the filing of the information. Indeed, no criminal matter exists until, and if, the prosecution issues a new information against the defendant. . . . If subsequently the prosecuting authority decides to proceed against the defendant, a new prosecution must be initiated." (Citation omitted; internal quotation marks omitted.) *State* v. *Richardson*, 291 Conn. 426, 430, 969 A.2d 166 (2009).

In the second case, the petitioner was charged with possession of a controlled substance, more than one-half ounce of cannabis, in violation of General Statutes (Rev. to 2015) § 21a-279 (a) (1) and possession of a controlled substance with intent to sell in violation of § 21a-277 (b). See *State* v. *Gusan*, Superior Court, judicial district of Tolland, Docket No. CR-16-0108498-S. Prior to the petitioner's plea, the state filed a substitute information under this docket number in which it relied solely on the latter charge.

allegedly illegal traffic stop.[3] The petitioner alleged that, but for Jelly's deficient performance, he would have rejected the state's plea offer and insisted on going to trial. With respect to these claims, the respondent, the Commissioner of Correction, left the petitioner to his proof.

On April 5 and 11 and June 1, 2022, the habeas court, *M. Murphy, J.*, held a trial on the merits of the petition. The petitioner presented the testimony of multiple witnesses and introduced numerous exhibits. Thereafter, the parties filed posttrial briefs.

In its memorandum of decision denying the petition, the habeas court set forth the following facts: "On the morning of February 26, 2016, at about 6:49 a.m., [the petitioner], who resided in Massachusetts, was driving through Coventry when Officer Mark Samsel [of the Coventry Police Department] observed [the petitioner] operating a motor vehicle while holding a black object, which appeared consistent with a cell phone, to his right ear. Samsel conducted a motor vehicle stop based on the conduct that he had observed. Although Samsel's body camera was off when he first observed [the petitioner] and pulled him over, Samsel turned on the body camera when [the petitioner's] vehicle came to a complete stop.

"Samsel approached the driver's door to speak with [the petitioner], who had lowered the window. Samsel asked if [the petitioner] was talking on his cell phone and if there was an emergency. [The petitioner] told Samsel that he was not on his cell phone and that the phone connects to the vehicle's stereo. Samsel asked

---

[3] Because the petitioner limits his appellate claims to the court's resolution of these grounds as alleged in count one of the operative petition, we need not and do not consider the court's resolution of the remaining grounds set forth in count one of the petition or the petitioner's freestanding claim of prosecutorial impropriety as alleged in count two of the petition.

[the petitioner] if he had his driver's license with him. After [the petitioner] responded that he did not have it with him, Samsel asked if [the petitioner] had a suspended license, which [the petitioner] acknowledged had been suspended for several years. Samsel, who had detected the odor of marijuana when he stood next to the open driver's window, asked [the petitioner] how much marijuana was in the vehicle. [The petitioner] responded that he had about two ounces. Samsel asked where the marijuana was, and [the petitioner] pointed to a bag. Samsel asked to see the bag and [the petitioner] handed it to Samsel. Inside the bag was another smaller bag containing individually knotted bags that, to Samsel, appeared to contain marijuana. Samsel asked [the petitioner] to step [out of] his vehicle. [The petitioner] complied with the request. Samsel observed [the petitioner] reach to his right between his thigh and the center console and remove a black cell phone, which appeared to Samsel to be consistent with the object he observed [the petitioner] holding at his right ear. Samsel handcuffed [the petitioner] and searched him for additional contraband. Samsel seized the black cell phone, which he considered reasonably to contain evidence of narcotics transactions and arrangements, and later applied for, and was granted, a search warrant to collect and analyze the cell phone data. Officer Brian Flanagan [of the Coventry Police Department] arrived on the scene of the motor vehicle stop after Samsel had made the arrest.

"[The petitioner] retained the services of [Jelly], who has practiced law since 1976. Jelly estimated that about [one] half of his cases historically have involved representing criminal defendants. Jelly has filed and argued many motions to suppress in his nearly [one-half] century of practicing criminal law, is familiar with the applicable legal standards for such motions, and has successfully argued motions to suppress. According to Jelly,

[the petitioner] maintained from the very [outset] that he had been illegally stopped because he had not been using his cell phone, which [the petitioner] insisted was connected to his vehicle via Bluetooth [wireless technology], and that Samsel was lying about his basis for the motor vehicle stop. Jelly obtained Samsel's body [camera] footage and reviewed it to prepare [the petitioner's] defense strategy, which focused on [the petitioner's] claim that Samsel lied about seeing [the petitioner] holding a cell phone to his right ear.

"Jelly reviewed all available video footage and police reports. Because the state had an open file policy and provided Jelly with all [of the] contents of its investigation, he did not file any pretrial motions. Jelly's file, which was entered into evidence in the habeas trial, contains a copy of an incident narrative dated March 28, 2016, as prepared by Samsel. The narrative details Samsel's actions subsequent to retrieving [the petitioner's] cell phone after [Lieutenant Andrew] Weaver [of the Hartford Police Department] completed [an extraction and analysis of the data stored in the cell phone by means of a forensic program known as Cellebrite]. Samsel reviewed the extracted data and 'discovered casual references to smoking "bud" and "weed" occurring in August and September of 2015.' . . . Samsel also noted: 'Other data contained on the disk was reviewed and found to be unremarkable or the file extension could not be opened.' . . .

"Jelly and [the petitioner] discussed a motion to suppress, which Jelly did not think would be successful. Jelly concluded that a motion to suppress would be a credibility determination between [the petitioner] and Samsel. [The petitioner's] lengthy criminal history and record would negatively impact his credibility. Even if [the petitioner] had not been holding a cell phone in his right hand, he nevertheless would have to discredit Samsel's reported observation to prevail on a motion

to suppress. Samsel's probable cause for the traffic stop was his reasonable and articulable suspicion that [the petitioner] was operating a motor vehicle while using a cell phone in violation of General Statutes § 14-296aa (b). Jelly also took into consideration that pursuing a motion to suppress that was not likely to be successful could make the state more resistant to resolving the criminal charges or result in a less favorable plea offer. Jelly noted that, earlier in his career, case law was more favorable when defendants filed motions to suppress. Jelly also referenced *Stone* v. *Powell*, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976), noting that, after the United States Supreme Court released that opinion, unsuccessful state challenges in search and seizure cases could not be subsequently raised in a federal habeas [case]. Jelly did not view the cell phone data extraction report as necessary to guiding his advice to [the petitioner] about pleading guilty.

"Jelly sought permission to withdraw from representation because of a breakdown in the attorney-client relationship. On March 30, 2017, when the matter was on the docket for [the petitioner] to change his plea, Jelly informed the court that he was not proceeding on his motion to withdraw. The court, *Oliver*, *J.*, questioned [the petitioner] about the motion to withdraw to clarify that he still intended to change his plea and resolve the cases. [The petitioner] acknowledged that he did not feel pressured to plead because of Jelly's motion to withdraw. [The petitioner] then pleaded guilty pursuant to [the *Alford* doctrine] to one count of possession with intent to sell marijuana in violation of . . . § 21a-277 (b). Judge Oliver conducted a thorough canvass, explained in detail the open-ended plea with a [sentence] rang[ing] from zero to seven years, and found that the plea was voluntarily and understandingly made with the assistance of competent counsel. The court ordered a presentence investigation (PSI) report

and continued the matter for sentencing. Jelly was present for the PSI interview and reviewed the report with [the petitioner] prior the sentencing.

"At the sentencing hearing on June 8, 2017, the state requested that [the petitioner] receive a sentence of twenty-five months to serve, followed by thirty-five months of special parole. Jelly noted that [the petitioner] had been offered eighteen months to serve during the plea negotiations but had rejected that offer when Jelly had recommended it. Jelly told the court that he nevertheless viewed the open plea as preferable to a trial because he was not optimistic about an acquittal. Jelly presented his arguments to the court and concluded by requesting that [the petitioner] receive a sentence such as the one that had been offered during the plea negotiations (i.e., eighteen months to serve). [The petitioner] then at length addressed the court, telling the court that he had been amenable to a twelve month sentence but balked at eighteen months followed by probation, which he did not think he could complete successfully. [The petitioner] informed the court that he had 'told [Jelly] from the beginning [that he] wanted the call log [extracted from his cell phone] because the call log itself can prove [that he was] not on the phone.' . . . [The petitioner] also told the court about the motion to suppress he wanted to pursue and [Jelly's] assessment about the credibility contest between [the petitioner] and Samsel. [The petitioner] continued to deny that he had been using his cell phone at the time Samsel indicated [that] he saw [the petitioner]. The court imposed a total effective sentence of twenty-five months to serve and fifty-nine months of special parole, which totaled eighty-four months, the equivalent of the seven year maximum [sentence that the petitioner] could receive.

"Jelly testified at the habeas trial that initially there were two alternative plea offers, one which involved

more incarceration followed by either special parole or probation, while the other involved less incarceration but more special parole. [The petitioner] did not accept either of these alternative offers. Then a court-indicated sentence was presented that entailed an open plea where both sides would present their respective sentencing arguments, which the court would consider together with the support letter [that the petitioner] provided and the PSI report. The sentence range [the petitioner] faced in an open plea was from no incarceration to a maximum of seven years to serve.

"Jelly had reservations [about] an open plea because he instead prefers a known, firm number that is negotiated and agreed upon. An open plea with arguments to the court can be riskier by comparison. Jelly recommended a negotiated sentence for a specific term of years. However, [the petitioner] wanted to have the opportunity to argue for the lowest sentence he could get from the court, so he accepted an open plea giving him the opportunity to present all the good things [the petitioner] had done since being released from [a previous term of incarceration].

"Samsel testified at the habeas trial that he observed an individual he did not recognize, but [who] was later determined to be [the petitioner], driving past his police cruiser. To Samsel, who estimated that he was about twenty-five feet away from [the petitioner] at the closest point, it appeared as though [the petitioner's] right hand was holding a black object that was consistent with being a cell phone to his right ear. Samsel then initiated a traffic stop based on that observation. Samsel manually activated his [body camera] prior to approaching [the petitioner's] vehicle. Samsel acknowledged at the habeas trial that [the petitioner] from the very [outset] protested and said that he was not on the phone, that he has Bluetooth connectivity for hands-free operation, and demonstrated its functionality. Samsel's incident

report contains [the petitioner's] protestation that he was not on the cell phone, [his statement that he] used Bluetooth, and [the fact that the petitioner] showed Samsel how his phone connect[ed] to the vehicle.

"When Samsel approached the vehicle, he detected an odor coming from the vehicle's interior that he suspected was marijuana. Samsel asked [the petitioner] for his license, registration, and proof of insurance. [The petitioner] essentially told Samsel that his driver's license was suspended in Massachusetts. Additionally, after Samsel asked [the petitioner] how much marijuana was in his vehicle, [he] told Samsel that he had about two ounces. Samsel asked [the petitioner] to hand him the marijuana, which [he] did. [The petitioner's] statements and the marijuana gave Samsel probable cause to further search the vehicle. [The petitioner] was arrested. It was determined that [the petitioner] had a total of 3.75 ounces of marijuana packaged in eighteen separate smaller bags, which is indicative of preparing the marijuana for sale to others. [The petitioner] also had $500 in cash that was confiscated.

"According to Samsel, he did not investigate the cell phone use any further once the marijuana became the focus, and he had no interest in [the petitioner's] cell phone unless it contained information that related to drug sales. The search warrant prepared by Samsel sought to recover evidence pertaining to drugs or drug sales. The extracted cell phone information did not show anything remarkable in the calls and texts that could assist the investigation into drug sale activities.

"[Weaver] of the Hartford Police Department received [the petitioner's] cell phone and utilized the Cellebrite forensic software program to extract data from the device. Cellebrite will produce call and message log reports from the recovered data. The extracted information was provided to Samsel so that the Coventry Police

Department could review the reports as part of the investigation into [the petitioner's] drug sale activity. At the habeas trial, Weaver confirmed that the reports do not indicate that any calls were deleted for the relevant time frame (i.e., prior to and during the traffic stop). Deleted calls could suggest an attempt to hide or cover up activity; however, the extracted cell phone data did not show any deleted calls during the relevant time.

"James Oulundsen, of I.R.I.S., LLC, a licensed private investigative agency specializing in criminal defense and digital forensics, testified about [the petitioner's] cell phone activity. [Weaver] . . . conducted the cell phone extraction of [the petitioner's] cell phone pursuant to a search warrant. Samsel initiated the traffic stop at 6:49 a.m., February 26, 2016, as indicated by Samsel and his [body camera] time stamp. Oulundsen estimated that the alleged cell phone violation would have occurred during the five minutes prior to Samsel initiating the traffic stop. The last cell phone activity prior to the traffic stop was an outgoing text message at 6:36:25 a.m. There was no cell phone activity between 6:44 and 6:49 a.m. However, there was cell phone activity during the traffic stop. At 6:51:34 a.m., there was a missed call; this time is consistent with the incoming call notification heard on Samsel's [body camera footage] at 6:52 a.m. A second missed call occurred at 6:54:22 a.m. Next, at 6:55:20 [a.m.], a text message was received by [the petitioner's] cell phone. A third missed call occurred at 7:00:05 a.m., which was also audible on the [body camera footage] at time stamp 7 a.m.

"[The petitioner] testified that the vehicle he was driving, a 2003 Chevrolet Trailblazer, had been equipped with an aftermarket radio with Bluetooth capability. [The petitioner] used the cell phone via the Bluetooth connection, which allowed him to make hands-free calls. Being able to make hands-free calls was important

to [the petitioner] because he was driving without a valid driver's license. The hands-free operation of the phone would decrease the risk of him being pulled over as he commuted regularly to and from Massachusetts and Connecticut. [The petitioner] took routes that he considered were less likely to be monitored by the police to reduce the likelihood of a traffic stop. [The petitioner] told Samsel his phone was connected to the vehicle's radio via Bluetooth and that he was not using the cell phone when Samsel observed him.

"[The petitioner] told Jelly that he was not on his cell phone and [that he] wanted [Jelly] to get the cell phone records to exonerate him. According to [the petitioner], Jelly said it did not matter if he was on the phone or not so long as Samsel thought he saw a cell phone in his hand at his right ear. [The petitioner] requested that Jelly obtain his cell phone records, but Jelly did not request them. According to [the petitioner], [Jelly] never told him that a search warrant had been executed on his cell phone, nor did he know that Weaver had conducted a search, extracted the data, and provided a Cellebrite report to the Coventry Police Department. Had [the petitioner] known this information, then he would have insisted that Jelly file a motion to suppress.

"[The petitioner] pleaded guilty under the *Alford* doctrine because he could then argue at sentencing that he was not on his cell phone and deny the other facts he contested. [The petitioner] and Jelly had discussed his criminal history and how that might impact the sentencing court. According to [the petitioner], Jelly told him his criminal history would not matter, nor would mistakes in the PSI report about his criminal history, because the conduct was ten or even twenty years ago.

"[The petitioner] had a separate criminal case in Rockville, the same district in which he pleaded guilty

in the present matter, in which there were plea negotiations. In the fall of 2021, the prosecutor who handled the present underlying criminal cases extended a plea offer to resolve the new criminal case on the condition that [the petitioner] would withdraw the present habeas [petition] with prejudice and agree to not bring other habeas challenges to the sentence. [The petitioner] rejected the state's offer. The state made a second plea offer that was better but still required withdrawal of the habeas [petition]. [The petitioner] again rejected the offer. Ultimately, [the petitioner] accepted a plea offer in 2022 that did not require him to withdraw the present habeas [petition] with prejudice.

"Although Samsel's report describes the cell phone as black, [the petitioner] testified at the habeas trial that his cell phone was silver. However, the cell phone, which was destroyed after the criminal case concluded, is more accurately described as having a silver back, while the glass screen appeared black on the screen side.

"[The petitioner] denied telling Samsel that he sold marijuana to pay bills such as his utility bill. [The petitioner] and Jelly reviewed the [body camera] footage, which does not show that [the petitioner] told Samsel he sold marijuana. [The petitioner] asked Jelly to file a motion to suppress in this case. [The petitioner] testified that he had criminal cases in both New Hampshire and Massachusetts where he benefitted from motions to suppress. Jelly's assessment was that a motion to suppress would not be successful because it would be a credibility contest between [the petitioner] and Samsel, and [the petitioner] was not likely to prevail. . . .

"[The petitioner] testified that the relief he seeks in this matter is to have the habeas court vacate his guilty plea and sentence and then remand the matter back to

the criminal court so that he can pursue a motion to suppress.

"Attorney Brian Carlow, [the petitioner's] expert witness on the standards of representation for criminal defense counsel, noted that it is an attorney's decision whether to file a motion to suppress after making a full assessment of the case. Additionally, the information given by the client to counsel is important to making an assessment. Carlow indicated that a cell phone search report pursuant to a search warrant would be an item that counsel should obtain and review with the client. However, if the police had the report and only provided a summary to the prosecutor, then an open file policy would not result in defense counsel having access to the report in the absence of discovery motions.

"A motion to suppress hearing challenging Samel's justification to initiate a traffic stop would require defense counsel to impeach Samsel. The information retrieved by Weaver could have been used to support [the petitioner's] contention that he was not on his cell phone when Samsel believed he saw [the petitioner] with the phone in his hand at his right ear. Carlow acknowledged that, if Samsel's testimony was found credible, then the traffic stop would be legally permissible, as well as the evidence obtained subsequent to the traffic stop. If Samsel was not found credible, conversely, then the traffic stop would not be legally permissible, and the drugs would be excluded.

"According to Carlow, the [body camera] footage is important because a comparison can be made to Samsel's report to highlight differences. Such differences can be used to attack Samsel's credibility. The results of Weaver's cell phone extraction could be used to show that [the petitioner's] phone was not in use when he was pulled over. Samsel's [body camera footage] could

be used in conjunction with the cell phone extraction report to show Samsel was not credible.

"Carlow emphasized that it is not a question of whether [the petitioner] was in fact using his cell phone. The critical question is whether Samsel truly believed that [the petitioner] had what appeared to be a cell phone in his right hand at his right ear. Carlow agrees that an attorney must have a good faith basis to file a motion to suppress and cannot file a frivolous motion. According to Carlow, filing a motion to suppress early in a case can be advantageous. Even if the motion to suppress is denied, a defendant can use it to negotiate a more favorable sentence in a plea negotiation. Another potential option is for a defendant to plead guilty in a written nolo contendere plea and preserve the ability to challenge the motion to suppress ruling on appeal." (Citations omitted; footnote omitted.)

Relevant to the claims raised in this appeal, the court set forth the following analysis: "The evidence clearly establishes that Jelly did not file a motion to suppress because he concluded that there was little likelihood of being successful. Jelly viewed a motion to suppress premised on the traffic stop as being a credibility contest between Samsel and [the petitioner]. The court agrees with that assessment. [The petitioner] has presented the extracted data and evidence from Oulundsen, as well as from Weaver, that presents a consistent body of evidence that [the petitioner's] cell phone was not in use immediately prior to the motor vehicle stop. Nevertheless, Samsel's basis for initiating the motor vehicle stop was that he believed that [the petitioner] was operating his vehicle while his right hand, holding what was consistent with a cell phone, was at his right ear. . . .

"The crux of any challenge to Samsel's observation can only center on whether it was reasonable and articulable, whether he had probable cause based on his

belief. It must be emphasized that Samsel conducted a motor vehicle stop because he believed [the petitioner] was operating his motor vehicle while holding a cell phone to his ear. Once Samsel approached the open driver's window, he detected what his experience led him to conclude was marijuana. Samsel then directly asked [the petitioner] how much marijuana he had in the vehicle. [The petitioner] told Samsel about two ounces. Samsel testified at the habeas trial about his observations and actions taken thereafter. The court found Samsel to be credible and discerns no reason why another court would find otherwise.

"The decision of whether to file a motion to suppress is made by counsel and is guided by experience, discretion, the evidence developed by investigation, the information provided by a client to counsel, and the strategy developed in a case. Filing a motion to suppress is a tactical decision made by counsel and, therefore, given great deference by courts reviewing postconviction habeas claims. . . . Jelly is presumed to have made a sound strategic decision when he did not file a motion to suppress unless [the petitioner] rebuts that presumption with sufficient evidence. Additionally, [the petitioner] must demonstrate that had Jelly filed a motion to suppress, that it would have been granted. . . .

"Given [the petitioner's] criminal history and all the circumstances surrounding the motor vehicle stop, the court concludes that Jelly's decision to not file a motion to suppress was a reasonable strategy. The court has no basis, given its own conclusion that Samsel was credible, to find that [the petitioner] would have prevailed in his motion to suppress. Furthermore, [the petitioner] has not presented any evidence or made a showing that had Jelly filed a motion to suppress, that the criminal court would have granted the motion. Jelly's concern that an unsuccessful motion to suppress could make the state more resistant to resolving the case with

a favorable plea agreement was neither unfounded nor unreasonable. . . . It was reasonable for Jelly to consider the effect of filing a motion to suppress on the likelihood of obtaining a favorable plea agreement.

"[The petitioner] alleges that Jelly rendered deficient performance because he failed to file a motion for discovery, which would have led to the defense having all the data extracted from the cell phone instead of Samsel's summary. Jelly did not view the cell phone data extraction report as necessary to guiding his advice to [the petitioner] about pleading guilty. While the cell phone date extraction report is consistent with [the petitioner's] representations that he was not using his cell phone at the time Samsel believed he was using the phone, that information was not knowable without the full extraction data. Because it is information that is consistent with [the petitioner's] representations to Samsel and Jelly, it was incumbent on Jelly to obtain and review the data extracted by Weaver.

"It was deficient performance by Jelly to not obtain the complete data extraction report. However, given what the court has already concluded about the likelihood of prevailing on the motion to suppress, which includes this court's consideration of the complete data extraction report, the court fails to see how this deficient performance prejudiced [the petitioner]. . . .

"[A]though [the petitioner] asserts that but for these alleged deficiencies, he would have rejected the state's plea offer and would have insisted on going to trial, he never testified that he would have proceeded to trial. [The petitioner] did testify that he wanted a motion to suppress hearing, presumably because he anticipates prevailing and the state's case imploding. What [the petitioner] never attested to was that he wanted to proceed to trial, a necessary component of [his cause

of action under the two-pronged test that governs ineffective assistance of counsel claims under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as modified for guilty plea cases by *Hill* v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)]. Therefore, [the petitioner] has failed to show how any alleged deficiencies by Jelly prejudiced him." (Citations omitted.)

After it disposed of all claims raised in the petition, the court denied the petition. Subsequently, the court granted the petitioner's petition for certification to appeal.

Before turning to the merits of the claims raised in this appeal, we set forth the governing legal principles and our standard of review. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [supra, 466 U.S. 687], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong of the *Strickland* test, the petitioner must demonstrate that his attorney's

representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . .

"It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Citations omitted; internal quotation marks omitted.) *Soto* v. *Commissioner of Correction*, 215 Conn. App. 113, 119–20, 281 A.3d 1189 (2022).

Cases, such as the present case, in which the petitioner's conviction follows a guilty plea, are governed by

*Hill* v. *Lockhart*, supra, 474 U.S. 58–60, which modified the prejudice prong of the *Strickland* test to focus on the extent to which counsel's allegedly deficient performance affected the outcome of the plea process. In *Hill*, the Supreme Court explained: "[T]he two-part [*Strickland*] test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the [*Strickland*] test is nothing more than a restatement of the standard of attorney competence . . . . The second, or prejudice, requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

"In many guilty plea cases, the prejudice inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. . . . As we

explained in [*Strickland*] these predictions of the out-
come at a possible trial, where necessary, should be
made objectively, without regard for the idiosyncrasies
of the particular decisionmaker." (Citation omitted;
footnote omitted; internal quotation marks omitted.) Id.

The alleged errors of trial counsel at issue in the
present claim of ineffective representation include Jel-
ly's failure to file a motion for discovery. This failure
is inextricably intertwined with Jelly's failure to file a
motion to suppress. In light of the Supreme Court's
focus in *Hill* on the extent to which counsel's errors,
if any, affected the outcome of the plea process, our
inquiry is not whether there was any basis in fact and
law to file a motion to suppress, but whether there was
a reasonable probability that filing a motion to suppress
would have resulted in the suppression of the evidence
of the petitioner's guilt.[4] This is because it is the court's
suppression of the evidence, not merely the filing of a
motion to suppress, that would have given rise to a
reasonable probability that the petitioner would not
have pleaded guilty.[5] As the United States Supreme

[4] In what appears to have been an alternative ground to support its conclu-
sion that the petitioner had failed to demonstrate prejudice, the court consid-
ered the petitioner's failure to present evidence that he wanted to proceed
to trial. In this case, however, the petitioner bore the burden of demonstrating
that Jelly's allegedly deficient performance in failing to file a motion to
suppress affected the outcome of the plea process. Because the petitioner
could have demonstrated prejudice by demonstrating that it was reasonably
likely that a motion to suppress would have resulted in the suppression of
all of the evidence of his guilt—thus rendering a trial and a guilty plea
under *Alford* unnecessary—it is irrelevant that the petitioner did not present
evidence that he wanted to proceed to trial.

[5] Although the petitioner argues that, if Jelly had brought a motion to
suppress based on the extraction report, such motion would have resulted
in the exclusion of the evidence on which the state relied, he nonetheless
argues that it was not necessary for him to demonstrate that the motion to
suppress would have resulted in the suppression of the evidence at issue.
The petitioner argues that it was sufficient for him to demonstrate that Jelly
failed to bring a suppression motion that was not frivolous, merely having
a basis in law or fact. The petitioner does not cite any persuasive authority
in support of his proposition and, in light of the authority discussed herein,

Court has observed, "[w]here defense counsel's failure to litigate a [f]ourth [a]mendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove *that his [f]ourth [a]mendment claim is meritorious* and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." (Emphasis added.) *Kimmelman* v. *Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).

These principles are illustrated in *Ricks* v. *Commissioner of Correction*, 98 Conn. App. 497, 499, 909 A.2d 567 (2006), cert. denied, 281 Conn. 907, 916 A.2d 49 (2007), an appeal from the judgment denying a petition for a writ of habeas corpus. In *Ricks*, the petitioner pleaded guilty under the *Alford* doctrine to felony murder. Id., 501. Following his conviction, he brought a habeas action in which he asserted a claim that his trial counsel rendered ineffective assistance, in part, because he failed to pursue a motion to suppress certain evidence integral to a finding of his guilt. Id., 501–502. In its plenary review of the ineffective representation claim under the *Strickland-Hill* standard set forth previously in this opinion, this court evaluated the merits of the suppression issue not for the purpose of determining whether a motion to suppress merely had a basis in law or fact, but whether it would have resulted in the exclusion of the evidence at issue. See id., 514. This court concluded, contrary to the petitioner's arguments, that his detention by the police was legal and, therefore, that he could not demonstrate prejudice in connection with his plea because a motion to suppress the evidence obtained as the fruit of that detention "would not have been successful." Id. This court cited the following principle: " 'In order to show ineffective

we agree with the respondent that the petitioner mischaracterizes his burden in proving prejudice in connection with the present claim.

assistance for the failure to make a suppression motion, *the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed.*' " (Emphasis added.) Id., quoting *United States* v. *Matos*, 905 F.2d 30, 32 (2d Cir. 1990).

The petitioner agrees with the court's determination that it was deficient performance by Jelly not to obtain the extraction report. The petitioner argues that, without the report, Jelly could not make a fully informed tactical decision about whether to file a motion to suppress. The respondent, however, urges us to conclude that the court failed to afford due deference to Jelly's view that, as it pertained to the issues that would have been before the court had a motion to suppress been filed, the report would not have assisted the defense because the question of whether the petitioner was actually using his cell phone was not dispositive of whether Samsel had a reasonable and articulable suspicion that he was doing so.

The petitioner disagrees with the court's determination that Jelly's failure to file a motion to suppress did not constitute deficient performance. Although the petitioner acknowledges that Jelly articulated tactical reasons for his decision, he argues that "any tactical decision must be based upon a proper investigation of the case and [Jelly] did not make such an investigation." The petitioner asserts that, without the ability to review the extraction report that was consistent with his representations concerning his cell phone use, Jelly was unable to provide him with a fully informed opinion with respect to the viability of a motion to suppress and whether he should accept the state's plea offer. The petitioner argues that, for these reasons, the court improperly deferred to Jelly's uninformed tactical decision in this case.

We conclude that it is unnecessary for us to consider whether the court was correct in its assessment of Jelly's performance as it pertained to both his failure to file a motion for discovery and his failure to file a motion to suppress. Instead, affording plenary review to the issue of prejudice, we conclude that, even if Jelly's performance were deficient, his omissions did not prejudice the petitioner because the petitioner has not demonstrated a reasonable probability that the motion to suppress would have been granted. See *Soto* v. *Commissioner of Correction*, supra, 215 Conn. App. 120 (court may focus on whichever prong of *Strickland* test is easier). More specifically, we are persuaded that, even if a suppression motion had been filed on the basis of the contents of the extraction report, it would not have contradicted the essential observation of Samsel that the petitioner was driving with a black, phone like object in his hand, in apparent violation of statute. Consequently, under the *Strickland-Hill* analysis, Jelly's omissions could not be said to have affected the plea process.

Because the court's resolution of the claim of ineffective assistance hinged on its analysis of the suppression issue, we set forth the principles that govern the denial of a motion to suppress.[6] "The standard of review in

---

[6] We recognize that the court's consideration of the suppression issue occurred in the context of a habeas corpus proceeding, not in connection with a motion to suppress evidence filed in a criminal proceeding. For several reasons, we are satisfied that, in its evaluation of prejudice, the court fully considered the suppression issue and that we may review the court's findings and conclusion with respect to that issue. First, the record reflects that the court heard the evidence on which the petitioner would have relied if Jelly had obtained the extraction report and presented it to the court in connection with a motion to suppress. Second, the parties presented relevant arguments to the court concerning the likelihood that the petitioner would have prevailed on a motion to suppress. Third, after setting forth relevant legal principles pertaining to the validity of the warrantless seizure at issue in this case, the court distinctly set forth its relevant findings and legal conclusions concerning the likelihood that the petitioner would have prevailed on a motion to suppress. In light of the foregoing, the petitioner has been afforded and has availed himself of an opportunity to

connection with the court's denial of a motion to suppress is well settled. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." (Internal quotation marks omitted.) *State* v. *Kaminski*, 106 Conn. App. 114, 124–25, 940 A.2d 844, cert. denied, 287 Conn. 909, 950 A.2d 1286 (2008).

Our Supreme Court has set forth the principles that govern investigatory detentions such as the one that occurred in the present case: "Under the fourth amendment to the United States constitution, and under article first, [§§ 7 and 9, of the] Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. . . . When considering

make a showing with respect to the likelihood of his prevailing on a motion to suppress. The petitioner has not explained how the evidence he would have presented in support of a motion to suppress in his criminal proceeding would be any different than the evidence he submitted on that issue before the habeas court. We therefore are satisfied that the court resolved the factual and legal merits of the fourth amendment claim on which the petitioner relied to demonstrate prejudice in his habeas case.

the validity of [an investigatory detention pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], our threshold inquiry is twofold. . . . First, we must determine at what point, if any . . . the encounter between [the police officers] and the defendant constitute[d] an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officers] possessed a reasonable and articulable suspicion [that the individual is engaged in criminal activity] at the time the seizure occurred. . . . In assessing whether the police officers possessed the requisite reasonable and articulable suspicion, we must consider whether, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . .

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 331 Conn. 239, 247–48, 203 A.3d 1233 (2019).

As he did before the habeas court, on appeal the petitioner attempts to demonstrate that the traffic stop itself was legally impermissible because Samsel did not have a reasonable and articulable suspicion to justify

the stop. The petitioner argues, and we agree, that "all of the evidence in [this] case was the result of the traffic stop conducted by [Samsel]. Therefore, if the stop itself were to be deemed illegal, then all of the evidence obtained from the petitioner's vehicle and cell phone—that is, all of the evidence in the case—would be inadmissible. There would be no prosecution possible."

According to the petitioner, "the evidence developed during the habeas hearing, including evidence [Jelly] did not bother to obtain despite being aware of its existence, raises significant questions about the validity of the traffic stop. . . . [D]espite [Jelly's] uninformed opinion that a motion to suppress would have been nothing but a credibility contest between [Samsel] and the petitioner . . . the court [in ruling on the suppression issue] would have been required to view all of the evidence and all of the circumstances of the case to determine if the traffic stop was warranted. . . .

"In this case, Samsel testified that he saw the petitioner driving with a black object that appeared to be a cell phone held to his right ear. The additional evidence in the case, however, strongly supports the petitioner's contention that it was not possible for Samsel to have made such an observation. The phone records indicate no phone calls in the relevant time frame. The [petitioner's vehicle] was equipped with a Bluetooth hands-free device that would have made holding the phone to one's ear unnecessary. The [body camera] footage reveals that the petitioner, when asked to exit the vehicle, retrieved the cell phone from a different location than the one claimed by [Samsel]. The state introduced no evidence, and there is none apparent in the footage of the incident, that reveals a plausible, reasonable alternat[ive] object that the petitioner could have been holding near his ear that might have led Samsel to the erroneous conclusion that the petitioner was using a cell phone. Further, only the screen of the

cell phone was black, which raised questions as to how the petitioner would be using his cell phone with the screen facing away from his ear.

"Based on the entire evidentiary picture, in short, the petitioner's motion [to] suppress . . . stood significant chance of success if the [proper degree of] scrutiny . . . were applied to this inquiry. The habeas court's conclusion that there was no credible evidence that a motion to suppress would have been meritorious is erroneous." (Citations omitted.)

The court's memorandum of decision plainly contradicts the petitioner's argument that the court did not consider all of the relevant evidence and relied solely on Samsel's testimony. The court specifically referred to the fact that, in considering the merits of the motion to suppress, it had considered the "complete data extraction report," which, as it aptly observed, was consistent with the petitioner's testimony that he was not using his cell phone at the time that Samsel had observed him. Although the petitioner refers in his appellate arguments to other evidence, including the body camera footage, that the court did not specifically discuss in its memorandum of decision, we decline the petitioner's invitation to speculate that the court overlooked that evidence in its assessment of the merits of the motion to suppress. To do so would violate the cardinal rule of appellate review that "[t]his court will neither speculate with regard to the rationale underlying the court's decision nor, in the absence of a record that demonstrates that error exists, presume that the court acted erroneously. . . . It is well settled that [we] do not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden [of] demonstrating the contrary." (Citations omitted; internal quotation marks omitted.) *White* v. *Latimer*

*Point Condominium Assn., Inc.*, 191 Conn. App. 767, 780–81, 216 A.3d 830 (2019).

The petitioner's remaining appellate arguments are not a model of clarity. Relying on evidence other than Samsel's testimony, he argues that the court failed to apply the proper degree of scrutiny to the issue before it. The petitioner appears to invite this court to second-guess the court's explicit finding that it "found Samsel to be credible and discerns no reason why another court would find otherwise." Although the petitioner may challenge the court's factual findings, he may not invite this court to revisit the court's credibility determinations. Indeed, a "pure credibility determination" made by a habeas court is "unassailable." *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 694, 159 A.3d 1112 (2017).

During Samsel's testimony at the habeas trial, the following colloquy between the petitioner's attorney and Samsel occurred:

"Q. Now, prior to you pulling [the petitioner] over at 6:49 a.m., you would've had to witness something in order to pull him over. What did you witness?

"A. I saw a white male who I didn't know as the defendant at the time holding his right hand to his right ear . . . . It was a black object consistent with a cell phone being held to his right ear by his right hand.

"Q. Okay. Now when you observed that, were you traveling on the road? Were you parked? Where were you? Were you in a car? Were you outside of your car? Where were you [when you] observed this white male holding his hand to his right ear?

"A. I was seated in my marked patrol vehicle on the shoulder of the highway at a right angle to the highway. And the [petitioner's vehicle] approached from my right going to my left.

"Q. All right. So, would you have been looking at the traffic as it was coming toward you?

"A. It was at a right angle to me, sir.

"Q. Well, at a right angle, but you were observing the traffic as it was coming toward you, away from you? What direction was the traffic traveling?

"A. Both directions, but the defendant was traveling as I said from my right to my left.

"Q. Okay. Do you recall what street or route he was on at the time that morning?

"A. Main Street . . . Route 31 . . . .

"Q. And in Coventry, Connecticut. Correct?

"A. That's true, yes.

"Q. All right. Now I know this is a long time ago, but from the time you saw this white man you didn't know holding the cell phone to his ear to the time you actually pulled him over, can you estimate how long that would've taken?

"A. I would estimate it was twenty to forty seconds."

During cross-examination of Samsel by the respondent's attorney, the following colloquy occurred:

"Q. . . . [I]f you remember with regard to [the petitioner], do you remember if you pulled him over for a motor vehicle stop?

"A. Yes, I did.

"Q. And . . . do you remember why you pulled him over?

"A. Because as he passed by the position I was in with my marked cruiser, I saw his right hand held to his right ear holding a black object I knew to be consistent with a cell phone."

Consistent with his testimony during his direct examination and cross-examination, Samsel testified during his redirect examination that he stopped the petitioner's vehicle because he saw him holding a device to his right ear that looked like a cell phone. Samsel testified that he believed that the petitioner was engaged in a motor vehicle violation, specifically, using his cell phone while operating a motor vehicle.

Samsel's testimony was consistent, and his testimony was deemed to be credible by the court. Although other evidence, including the extraction report, may have cast doubt as to whether the petitioner actually held a cell phone to his ear as he drove past Samsel, none of that evidence undermined the court's reliance on Samsel's testimony as to what he had perceived prior to the stop or precluded the court from relying on that testimony to find that Samsel believed in good faith that the petitioner was holding an object that appeared to be a cell phone to his ear. Thus, our careful review of the evidence as a whole, including the evidence on which the petitioner relies, does not lead us to conclude that the court erroneously found that an adequate factual basis existed to support the *Terry* stop. Here, Samsel articulated a credible, particularized, and objective basis for suspecting that the petitioner was engaged in a motor vehicle violation. The specific information on which Samsel relied, and the rational inferences to be derived therefrom, supported the stop because a reasonable person, having the information available to and known by Samsel, would have suspected that the petitioner was engaged in illegality.

In the context of the habeas trial, the court fully analyzed the suppression issue raised by the petitioner. In light of its proper analysis of that issue, we agree with its ultimate conclusion that Jelly's allegedly deficient performance in failing to file a motion to suppress did not affect the plea process. Accordingly, under the

*Strickland-Hill* test, the petitioner has failed to demonstrate that he was prejudiced as a result of the omissions on which he relied.

The judgment is affirmed.

In this opinion the other judges concurred.